IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Case No. 5:20-cv-411-BO

| | |
|---|---|
| HELEN JO TALIAFERRO, KENNETH DURDEN, KENDALL GIBBS, RICKY SCOTT, NORTH CAROLINA COUNCIL OF THE BLIND, INC., GOVERNOR MOREHEAD SCHOOL ALUMNI ASSOCIATION, INC., and DISABILITY RIGHTS NORTH CAROLINA,<br><br>      Plaintiffs,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS, KAREN BRINSON BELL, in her official capacity as Executive Director of the NCSBOE, DAMON CIRCOSTA, in his official capacity as Chair of the NCSBOE, STELLA ANDERSON, in her official capacity as Secretary of the NCSBOE, KEN RAYMOND, in his official capacity as Member of the NCSBOE, JEFF CARMON III, in his official capacity as Member of the NCSBOE, and DAVID C. BLACK, in his official capacity as Member of the NCSBOE,<br><br>      Defendants. | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

## PRELIMINARY STATEMENT

The right to vote "is of the most fundamental significance under our constitutional structure." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) (citing *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)). Protecting the right of people with disabilities to vote was one of Congress's motivating factors in passing the Americans with Disabilities Act. 42 U.S.C. § 12101(a)(3). The Plaintiffs seek a Motion for a Preliminary Injunction and ask the Court to ensure North Carolinians have equal access to the Absentee Voting Program in

November, access which has become more pressing and critical in light of a new, unforeseen threat to the right to vote: the COVID-19 virus.

This case was filed by several blind individuals who normally vote in person, privately and independently, at their polling places on election days. The general election in November 2020 is an important election, and Plaintiffs want to vote in it. Plaintiffs Helen Jo Taliaferro, Kenneth Durden, Kendall Gibbs, and Ricky Scott are blind or low-vision, members of the North Carolina Council of the Blind, and registered to vote in North Carolina. Mr. Scott is also a member of the Governor Morehead School Alumni Association, Inc. ("GMSAAI"), a nonprofit organization that advances the interests of the School's Deaf and blind students and graduates. All Plaintiffs are constituents of Disability Rights North Carolina ("DRNC"), North Carolina's federally-mandated Protection and Advocacy System (P&A) for people with disabilities.

In an effort to keep social distancing measures to avoid contracting or spreading COVID-19, Plaintiffs do not plan to vote in-person in November. Defendant North Carolina State Board of Elections offers a better alternative in these circumstances: absentee voting, which is available to all voters in the state and can be done from the privacy and safety of a voter's home. Unfortunately, Defendants' Absentee Voting Program offers Plaintiffs only standard print paper ballots, which Plaintiffs cannot read or mark by themselves because of their disability. If they use a paper ballot, they must compromise the privacy and independence of their votes—the very hallmarks of voting in the United States—by locating and asking someone to fill out their ballots for them. No other voters but voters with disabilities are being required by Defendants to make this impossible choice. Plaintiffs are among about 240,000 North Carolinians over age 18 who

2

have a vision disability and who may be affected by the inaccessibility of Defendants' Absentee Voting Program.[1]

Other states handle the inaccessibility of paper ballots by using various technological solutions, some available for free, to enable voters with disabilities to receive and mark their ballots on their computers, tablets, or phones. Voters with disabilities can thus vote absentee privately and independently. Defendants do not use these systems. Defendants do, however, offer email and fax ballot delivery and return for certain military and overseas voters, but do not offer this option to voters with disabilities. Plaintiffs therefore come before this Court asking for a preliminary injunction directing Defendants to implement an accessible absentee ballot in time for the November 2020 general election.

## FACTS

### A. The COVID-19 Pandemic has Made it Less Safe to Vote in Person.

North Carolina, as with the rest of the United States, is currently in the grip of a viral pandemic that has caused extensive illness, complications, and death. People with disabilities are at higher risk of serious complications or death from COVID-19, as are those with other risk factors, including older adults, those with immune deficiencies, heart, lung, kidney, or liver disease, diabetes, chronic lung disease, asthma, or obesity.[2] While blindness on its own is not a risk factor for COVID-19, people with vision disabilities may have increased risk of exposure

---

[1] *See* U.S. Census Bureau, *Disability Characteristics Dataset*, https://data.census.gov/cedsci/table?q=S18&d=ACS%201-Year%20Estimates%20Subject%20Tables&g=0400000US37&tid=ACSST1Y2018.S1810&hidePreview=true.

[2] *See Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last updated July 30, 2020). Research shows that people who are Black and/or Latino are three times more likely to contract the virus as people who are white. Richard A. Oppel Jr. et al., *The Fullest Look Yet at the Racial Inequity of Coronavirus*, NEW YORK TIMES (July 5, 2020), https://www.nytimes.com/interactive/2020/07/05/us/coronavirus-latinos-african-americans-cdc-data.html.

due to their disabilities.[3]  People with vision disabilities often rely on touch more than sighted people and therefore are at heightened risk of touching surfaces with the virus. Further, blind people may have difficulty social-distancing because they may not be able to tell if others around them are adequately distanced, nor can they as readily confirm whether others around them are wearing masks.[4]

Currently, there is neither a vaccine nor a cure for COVID-19.  As of August 10, over 136,000 in North Carolina people have contracted the virus, and 2,195 have died.[5] Approximately 1,111 North Carolinians are currently hospitalized, daily hospitalizations have not dropped below 1,000 since July 9.[6]  At the end of July, over 75% of inpatient hospital beds and 78% of intensive care unit beds were in use.[7]

As daily COVID-19 case counts and hospitalizations increase across the state, the Governor issued several executive orders recognizing the value of social distancing to reduce spread of the virus and the risks inherent in large groups of people gathering in a single location for more than a few minutes.[8]  The Governor also recognized that people over the age of 65 and

---

[3] *See* Lee Rogers, *COVID-19 and Blindness: Staying Safe and How to Help*, WORLD SERVICES FOR THE BLIND, https://www.wsblind.org/blog/2020/3/26/covid-19-and-blindness-staying-safe-and-how-to-help (March 26, 2020).

[4] Nicholas A. Giudice, *COVID-19 and blindness*, MEDIUM (June 2, 2020), https://medium.com/@nicholas.giudice/covid-19-and-blindness-why-the-new-touchless-physically-distant-world-sucks-for-people-with-2c8dbd21de63.

[5] *North Carolina Coronavirus Map and Case Count*, NEW YORK TIMES (Aug. 10, 2020, 4:01 PM), https://www.nytimes.com/interactive/2020/us/north-carolina-coronavirus-cases.html.

[6] *Hospitalizations*, N.C. DEP'T OF HEALTH AND HUMAN SERVS. (Updated Aug. 10, 2020), https://covid19.ncdhhs.gov/dashboard/hospitalizations.

[7] Bailey Aldridge & Simone Jasper, *Coronavirus live updates: Here's what to know in North Carolina on July 23*, NEWS & OBSERVER (July 23, 2020), https://www.newsobserver.com/news/coronavirus/article244420247.html.

[8] Exec. Order No. 117 (Mar. 14, 2020) (prohibiting mass gatherings, closing schools, and urging all people to maintain six feet of social distance from others); Exec. Order No. 120 (Mar. 23, 2020) (placing additional limitations on group gatherings); Exec. Order 121 (Mar. 27, 2020) (ordering all North Carolinians to stay in their homes); Exec Order 131 (Apr. 9, 2020)

4

those with serious underlying medical conditions are at heightened risk of severe illness from COVID-19, and recommended that people in this high risk group to stay home unless travel is "absolutely essential."[9]

As with all facets of public life, voting has had to change to address COVID-19. The Centers for Disease Control and Prevention (CDC) recommends that states "offer alternative voting methods that minimize direct contact and reduce crowd size at polling stations."[10] The North Carolina State Board of Elections applied for and was granted almost $11 million in federal funds under the Coronavirus Aid, Relief, and Economic Security (CARES) Act for measures to make elections safer this year, including additional funding for absentee ballots.[11] Defendants themselves express continued concerns about the risks of in-person voting in North Carolina, including a lack of hand sanitizer, requiring voters to use contaminated pens and styluses, a shortage of personal protective equipment for elections officials, and the closure of in-person polling places and county boards of elections in response to the pandemic.[12] In response

---

(establishing Emergency Maximum Occupancy rates at stores and retail locations); Exec. Order No. 147 (June 24, 2020) (requiring face coverings in certain settings to address troubling trends in COVID-19 metrics); Exec. Order 151 (July 16, 2020) (recognizing higher risk of contracting COVID-19 in settings where people "are in close physical proximity" for more than 15 minutes, recognizing the value of social distancing to reduce spread, recognizing continuing increases in COVID-19 cases and hospitalizations in North Carolina).

[9] Exec. Order No. 141 (May 20, 2020).

[10] *Considerations for Election Polling Locations and Voters: Interim guidance to prevent spread of coronavirus disease 2019 (COVID-19)*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated June 22, 2020).

[11] Karen Brinson Bell, *CARES Act Request and Clarification to Recommendations to Address Election-Related Issues Affected by COVID-19*, N.C. STATE BD. OF ELECTIONS (Apr. 22, 2020), https://s3.amazonaws.com/dl.ncsbe.gov/Outreach/Coronavirus/State%20Board%20CARES%20Act%20request%20and%20legislative%20recommendations%20update.pdf.

[12] Karen Brinson Bell, *CARES Act Grant Update*, N.C. STATE BD. OF ELECTIONS (Apr. 29, 2020), https://s3.amazonaws.com/dl.ncsbe.gov/Outreach/Coronavirus/SBE_CARES%20Act%20Update_04292020.pdf.

5

to the dangers of in-person voting under the pandemic, a record number of North Carolina voters have requested absentee ballots for the upcoming General Election, with estimates of between five to eight times as many requests expected for the 2020 General Election as those submitted during the 2016 General Election.[13]

COVID-19's impact on voting comes at a particular cost to blind voters. Blind citizens voting at polling places typically use an accessible voting machine to read and mark their ballots so that they may vote privately and independently, without having to disclose their choices to someone "helping" them fill out a ballot.[14] No accessible ballot marking option is offered in North Carolina to help blind voters fill out an absentee ballot. Such voters must find someone sighted and rely on that person to fill out the ballot accurately, without comment or pressure, and to keep their vote a secret. *See e.g.*, N.C. Gen. Stat. §§ 163-226.3 (enumerating limited categories of individuals allowed to assist). Furthermore, the process for receiving an absentee ballot is itself inaccessible: the electronic version of the current request form is not compatible with screen reader assistive technology to permit voters to independently complete the ballot request form, Declaration of Christopher Bell ¶ 8 (hereinafter "Bell Decl."), and the completed form must be printed out and signed in hard copy (the "wet signature" requirement), N.C. Gen. Stat. § 163-230.2. The request form must then be mailed, emailed, faxed or hand-delivered to the voter's county board of elections. H1169, 2020 N.C. Sess. Laws, § 2.(a). The General

---

[13] *See* Josie Taris & Anita Rao, *NC Voters Request Absentee Ballots In Unprecedented Numbers*, NORTH CAROLINA PUBLIC RADIO (July 27, 2020), https://www.wunc.org/post/nc-voters-request-absentee-ballots-unprecedented-numbers; Bill O'Neil, *North Carolina voters requesting absentee ballots at record rates amid the coronavirus pandemic*, WXII12 (July 27, 2020), https://www.wxii12.com/article/north-carolina-absentee-ballots-coronavirus-pandemic/33437009#.

[14] Letter from Karen Brinson Bell, Exec. Dir. NCSBOE, to Virginia Knowlton-Marcus, Chief Exec. Off. DRNC, and Stuart Seaborn, Managing Dir. Litigation DRA (Jul. 24, 2020) (attached as Exhibit A).

6

Assembly recently approved legislation allowing for an online absentee ballot request form, however that program will not be implemented until September 1, 2020. *Id.* at § 7. Without the Court's intervention, blind voters who choose to vote absentee in November must sacrifice the privacy and independence of their vote, an option which is unacceptable to Plaintiffs and under the ADA and the Rehabilitation Act.

**B. The Individual Plaintiffs' Desire for an Accessible Absentee Ballot for the November 2020 Election**.

Plaintiff Helen Jo Taliaferro is registered to vote in North Carolina. Declaration of Helen Jo Taliaferro ¶ 3 (hereinafter "Taliaferro Decl."). She is 68 years old. *Id.* at ¶ 4. Ms. Taliaferro is blind and is Treasurer of the North Carolina Council of the Blind. *Id.* at ¶¶ 7-8. Ms. Taliaferro has voted in past elections using an accessible voting machine and plans to vote in the November 3, 2020 General Election and in subsequent federal, state and local elections. *Id.* at ¶¶ 5-6. Because of her vision disability, Ms. Taliaferro is unable to read or fill out a paper absentee ballot. *Id.* at ¶ 7. Ms. Taliaferro regularly uses a tablet and smartphone with screen reader assistive technology to read, fill out, and sign accessible electronic documents. *Id.* at ¶ 10. Ms. Taliaferro would like to vote absentee privately and independently, as other North Carolinians are entitled to do, using the assistive technology that she already uses regularly, especially given the COVID-19 pandemic and her high-risk status as an older person. *Id.* at ¶¶ 11-13.

Plaintiff Kenneth Durden is registered to vote in North Carolina. Declaration of Kenneth Durden ¶ 3 (hereinafter "Durden Decl."). He is blind and has been diagnosed with Type II diabetes and hypertension. *Id.* at ¶¶ 5, 9. Mr. Durden is a member of the North Carolina Council of the Blind, and President of its Charlotte Chapter. *Id.* at ¶ 8. Mr. Durden has voted in past elections and plans to vote in the November 3, 2020 General Election and in subsequent federal, state and local elections. *Id.* at ¶ 4, 12. Because of his vision disability, Mr. Durden is unable to

read or fill out a paper absentee ballot. *Id*. at ¶ 5. Mr. Durden's preferred format is Braille, and

he sometimes uses a computer and smartphone with assistive technology to read, fill out, and

sign accessible electronic documents. *Id*. at ¶ 6. Mr. Durden regularly votes in person using an

accessible voting machine. *Id*. at ¶ 12. However, he now plans to vote by absentee ballot due to

the COVID-19 pandemic. *Id*. at ¶ 13. He was hospitalized for nearly three weeks in April 2020

after contracting the virus, including nearly two weeks in the Intensive Care Unit, and he fears

being exposed a second time if he votes in person, especially given his risk factors of Type II

diabetes and hypertension. *Id*. at ¶¶ 14-19.

Plaintiff Kendall Gibbs is registered to vote in North Carolina. Declaration of Kendall

Gibbs ¶ 3 (hereinafter "Gibbs Decl."). Ms. Gibbs has low vision and does not have enough

vision to read, mark, and sign a standard print ballot without assistance. *Id*. at ¶ 5. She is also a

board member of the North Carolina Council of the Blind. *Id*. at ¶ 8. Ms. Gibbs has voted in past

elections and plans to vote in the November 3, 2020 General Election and in subsequent federal,

state and local elections. *Id*. at ¶ 4, 11. Because of her vision disability, Ms. Gibbs is unable to

read standard print or to identify the proper location for a signature on standard print documents.

*Id*. at ¶ 5. Ms. Gibbs uses a computer with screen reader assistive technology to read, fill out,

and sign accessible electronic documents. *Id.* Ms. Gibbs regularly votes in person using an

accessible voting machine. *Id*. at ¶ 11. However, she would like to vote absentee privately and

independently, using the assistive technology that she already uses regularly, especially given the

COVID-19 pandemic and the risks posed by voting in person. *Id*. at ¶¶ 11-16.

Plaintiff Ricky Scott is registered to vote in North Carolina. Declaration of Ricky Scott ¶

3 (hereinafter "Scott Decl."). Dr. Scott is blind and a member of both the NCCB and the

GMSAAI. *Id*. at ¶ 6. Dr. Scott has voted in past elections and plans to vote in the November 3,

2020 General Election and in subsequent federal, state and local elections. *Id*. at ¶¶ 4, 9-10.

Because of his vision disability, Dr. Scott is unable to read or fill out a paper absentee ballot. *Id*.

at ¶ 9. Dr. Scott regularly uses a computer with screen reader assistive technology to read, fill

out, and sign accessible electronic documents. *Id*. at ¶ 5. Dr. Scott last voted by absentee ballot

approximately twenty-five years ago. *Id*. at ¶ 9. However, he required the help of a sighted

assistant to complete the inaccessible print ballot, so he had to forfeit the privacy and

independence of his vote. *Id.* In order to vote privately and independently, he has since voted in

person using an accessible voting machine. *Id*. at ¶ 10. He would now like to vote absentee

privately and independently, as other North Carolinians are entitled to do, using the assistive

technology that he already uses regularly, especially given the COVID-19 pandemic and the

risks posed by voting in person. *Id*. at ¶¶ 11-16.

### C.  Many Accessible Absentee Ballot Options are Available.

Standard print paper absentee ballots are not the only option, and accessible options are

plentiful.  Blind voters can request, receive, mark, and/or submit their ballots privately and

independently by using online ballot marking tools.  Free electronic voting tools are available,

including Prime III (used in Washington, Oregon, and New Hampshire) and the State of

Maryland online ballot marking tool.  Numerous other states use commercially available

accessible electronic absentee ballot marking tools (such as Democracy Live,[15] Scytl, and Five

Cedars).  All these systems allow voters to access their absentee ballots through their web

---

[15] At least 15 states and many local boards of elections across the country have certified the Democracy Live voting system for use in elections. *Approvals, Reviews, and Certifications*, DEMOCRACY LIVE, https://democracylive.com/approvals-reviews-and-certifications/ (last visited Aug. 5, 2020). The Democracy Live system has been "[s]elected by the Department of Defense to assist military voting and a member of the Department of Homeland Security sponsored Elections Coordinating Council[.]" *Our Company*, DEMOCRACY LIVE, https://democracylive.com/our-company/ (last visited Aug. 5, 2020).

browser, and to read and mark their ballots on their computers using assistive technology, such as screen magnification or screen reading software. Voters then either print their ballots and mail them back to their local boards of elections, or return them by email or online, to be counted. These tools have been tested, approved, and successfully used by individuals with print disabilities to vote independently and privately in elections held across the country. Declaration of Lou Ann Blake ¶¶ 27-29.

In fact, Defendants already offer certain voters the option to receive and return ballots in alternative format, including electronic format—just not to voters with disabilities. As all states must do, North Carolina participates in a special absentee voting program for military and overseas voters under the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 52 U.S.C. §§ 20301 *et seq*., as amended by the Military and Overseas Voter Empowerment Act ("MOVE Act"), National Defense Authorization Act for Fiscal Year 2010, Pub. L. No. 111-84, §§ 575-589, 123 Stat. 2190, 2318-35 (2009). Absentee ballots are available by mail, fax, or email 30 days prior to municipal elections, 50 days prior to statewide primaries, and 60 days prior to general elections.[16] Overseas military and overseas voters may return their completed ballots by fax or email, and in-country military may return their completed ballots by mail by the close of polls on Election Day (7:30 p.m. EST).[17] Though other states have expanded their UOCAVA absentee voting systems to include voters with print disabilities—including recently North Carolina's neighbor state of Tennessee, (*see* Keller Decl. ¶ 5)—North Carolina has yet to permit voters to gain access to its UOCAVA program based on disability status.

---

[16] *Military and Overseas Voting*, N.C. STATE BD. OF ELECTIONS, https://www.ncsbe.gov/Voting-Options/Military-Overseas-Voting (last visited Aug. 11, 2020).
[17] *Id.*

Defendants know that their absentee voting program discriminates against blind voters and have yet to act. On June 29, 2020 DRNC and DRA submitted a letter to Defendants outlining the barriers to absentee voting for voters who are blind, along with requested remedies. Correspondence, attached as Exhibit B. To date, Defendants have not committed to addressing the barriers raised in the letter.

## ARGUMENT

## I. A PRELIMINARY INJUNCTION SHOULD BE ISSUED TO ENSURE PLAINTIFFS CAN PRIVATELY AND INDEPENDENTLY CAST AN ABSENTEE BALLOT IN THE NOVEMBER PRESIDENTIAL ELECTION.

The ADA prohibits government action that "denie[s] the benefits of a public service, program, or activity" on the basis of disability. *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016). "Voting is a quintessential public activity" as contemplated by the ADA. *Id.* at 507. The Fourth Circuit has already held that "effectively requiring disabled individuals to rely on the assistance of others to vote absentee" denies such voters meaningful access to that quintessential public activity. *Id.* The paper absentee ballot excludes Plaintiffs from North Carolina's Absentee Voting Program.

A party seeking a preliminary injunction must demonstrate that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of an injunction, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).[18] Plaintiffs demonstrate all these factors, and a

_____

[18] Although Federal Rule of Civil Procedure 65(c) requires that a movant for a preliminary injunction should give security, "the district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Delia*, 709 F.3d at 332. Plaintiffs request that the Court do so here.

preliminary injunction directing Defendants to make their absentee ballot program accessible is necessary.

   **A. Plaintiffs are Likely to Succeed on their Claims that the ADA and Rehabilitation Act Require an Accessible Absentee Ballot.**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A successful claim under Title II of the Americans with Disabilities Act consists of three elements: (1) that the plaintiffs are individuals with disabilities who are qualified to benefit from a government program, service, or activity; (2) that Defendants running that program are covered entities under the statute; and (3) that plaintiffs were denied the benefits of the service, program, or activity, or otherwise discriminated against, on the basis of their disability. *Lamone*, 813 F.3d at 502-03. Claims under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, against federally funded entities, are generally given the same analysis. *J.D. ex rel. Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 669 n.6 (4th Cir. 2019). Plaintiffs demonstrate all three elements, and thereby demonstrate a likelihood of success on the merits.

   **1. Plaintiffs are qualified individuals with disabilities.**

Plaintiffs easily meet their first requirement: that they are qualified individuals with disabilities. Under the ADA, a disability is a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(1)(A). All the individual Plaintiffs are blind or have low vision, which substantially limits their ability to read print, and are members or constituents of the organizational Plaintiffs. Taliaferro Decl. ¶ 7;

12

Durden Decl. ¶ 5; Gibbs Decl. ¶ 5; Scott Decl. ¶ 5; Bell Decl. ¶ 6; Declaration of Fred McEachern ¶ 5 (hereinafter "McEachern Decl.").

A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies or practices . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for . . . participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2); *see also* 29 U.S.C. § 794. All the individual Plaintiffs are registered to vote in North Carolina, intend to vote in the November 2020 election, and are entitled to vote by absentee ballot if they so choose. N.C. Gen. Stat. § 163-230.1. *See* Taliaferro Decl. ¶¶ 3, 5-6; Durden Decl. ¶¶ 3-4; Gibbs Decl. ¶¶ 3, 11; Scott Decl. ¶¶ 3-4, 9-10; Bell Decl. ¶ 7; McEachern Decl. ¶ 6. They are qualified to participate in Defendants' absentee voting program. Plaintiffs are qualified individuals with disabilities under the relevant statutes.

### 2. Defendants must comply with the ADA and the Rehabilitation Act.

Defendants are covered entities under the statutes as well. Title II of the ADA governs the conduct of any "public entity," meaning "(A) any State or local government; [or] (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1). Section 504 of the Rehabilitation Act governs the programs or activities of all recipients of federal financial assistance. 29 U.S.C. § 794(b). Defendant North Carolina State Board of Elections is created under the laws of the State of North Carolina, has "general supervision" over the primaries and elections in the State, and has authority to make reasonable rules and regulations for those elections, N.C. Gen. Stat. § 163-22, and therefore constitutes a public entity. The individual Defendants are members and officers of the Board and are sued here in their official capacities at a public entity. *See Lamone*, 813 F.3d at 502-03

13

(noting that the "public entity" prong of the ADA was not in question where various individuals were sued in their official capacities). Defendants' receipt of CARES Act funding makes them subject to the Rehabilitation Act.[19] Defendants are public entities subject to the ADA and the Rehabilitation Act.

### 3. Plaintiffs are being denied the benefits of North Carolina's Absentee Voting Program because they are blind.

Plaintiffs cannot access the Absentee Voting Program in North Carolina because of their blindness and inability to read Defendants' standard-size print paper ballots. In fulfilling the nondiscrimination mandate of Title II of the ADA, a public entity may not, in providing any aid, benefit, or service, "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service[,] [a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others[,]" or "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others[.]" 28 C.F.R. §§ 35.130(b)(1)(i)-(iii); *accord* 45 C.F.R. § 84.4(b)(1)(ii)-(iii) (Rehabilitation Act). Nor can a public entity employ unnecessary policies, practices, criteria or methods of administration that have the effect or tendency of excluding or discriminating against persons with disabilities. 28 C.F.R. § 35.130(b)(3),(8).

It is legally uncontroversial for the Court to recognize that standard print, paper-only absentee ballots discriminate against blind voters. *See Hindel v. Husted*, 875 F.3d 344, 345 (6th

---

[19] Karen Brinson Bell, *CARES Act Request and Clarification to Recommendations to Address Election-Related Issues Affected by COVID-19*, N.C. STATE BD. OF ELECTIONS (Apr. 22, 2020), https://s3.amazonaws.com/dl.ncsbe.gov/Outreach/Coronavirus/State%20Board%20CARES%20Act%20request%20and%20legislative%20recommendations%20update.pdf.

14

Cir. 2017) (plaintiffs stated a cause of action under the ADA by alleging that with paper-only absentee ballots, "blind voters must seek the aid of a sighted person in order to vote absentee, thus depriving them of the ability to vote anonymously"); *Lamone*, 813 F.3d at 507 ("by effectively requiring disabled individuals to rely on the assistance of others to vote absentee, defendants have not provided plaintiffs with meaningful access to Maryland's absentee voting program"); *Drenth v. Boockvar*, Civil No. 1:20-CV-00829, 2020 WL 2745729, *5 (M.D. Pa. May 27, 2020) ("Plaintiffs have also been denied the benefits of a public program—in this case the ability to vote privately and independently without being physically present at a polling location—because of their disability").

First, absentee voting is a "program, service, or activity" under the ADA in its own right, especially where, as here, all voters in the jurisdiction have the option to vote absentee. *Lamone*, 813 F.3d at 504 (recognizing and analyzing the accessibility of the absentee voting program as its own program required to be accessible to people with disabilities). *See also Husted*, 875 F.3d at 344 (accepting that absentee voting was the program, service, or activity to be analyzed); *Boockvar*, 2020 WL 2745729 (same); *Democracy N.C. v. N.C. State Bd. of Elections*, No. 1:20CV457, 2020 WL 4484063, *56 (M.D. N.C. Aug. 4, 2020) (analysis focused solely on accessibility of Absentee Voting Program). "It is abundantly clear that Defendants are obligated to provide a level of access to their voting program beyond the simple assurance that voters with disabilities are able to cast a ballot in some way, shape, or form." *United Spinal Ass'n v. Bd. of Elections in N.Y.C*, 882 F. Supp. 2d 615, 623 (S.D. N.Y. 2012).

Second, sighted voters need no assistance to review and fill out a paper absentee ballot, whereas blind voters are necessarily dependent on sighted assistants to review and fill out standard print paper ballots. The right to a secret ballot, including a secret absentee ballot, has

long been recognized in North Carolina. *Withers v. Bd. of Comm'rs*, 196 N.C. 535, 146 S.E. 225 (1929). Forcing blind voters to depend on sighted assistants to cast an absentee ballot offends both the principle of a private vote and the nondiscrimination principles of the ADA, the Rehabilitation Act, and other federal law guaranteeing that voters in federal elections be able to vote privately and independently. *See* Help America Vote Act of 2002, Pub. L. 107–252 § 301, 116 Stat. 1666, 1704 (*codified as amended at* 52 U.S.C. § 21081) (enshrining the right to review and change one's ballot privately and independently in federal elections). *See also* 28 C.F.R. § 35.160(b)(2); *Disabled in Action v. Bd. of Elections in N.Y.C*, 752 F.3d 189, 199 (2d Cir. 2014) (emphasizing the importance of privacy and independence for voters with disabilities in the context of a public entity's voting program); *Cal. Council of the Blind v. Cnty. of Alameda*, 985 F. Supp. 2d 1229, 1238 (N.D. Cal. 2013) ("[O]ne of the central features of voting, and one of its benefits, is voting privately and independently. . . . [U]nder the terms of the ADA or the Rehabilitation Act, the covered entity must provide meaningful access to private and independent voting."). Defendants' requirement that disabled individuals rely upon the kindness, availability, and accuracy of nondisabled third parties to assist them in filling out their absentee ballots violates the rights of voters with disabilities. *See Lamone*, 813 F.3d at 507 ("The right to vote should not be contingent on the happenstance that others are available to help.") (quoting *Bd. of Elections in N.Y.C.*, 752 F.3d at 200); *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1264 (D.C. Cir. 2008) ("While [t]here was a time when disabled people had no choice but to ask for help—to rely on the kindness of strangers[,] . . . [i]t can no longer be successfully argued that a blind person has meaningful access to currency if she cannot accurately identify paper money without assistance.") (internal quotations omitted). Paper absentee ballots violate these principles and so are discriminatory.

16

A corollary of the right to a private and independent ballot is the right to independently read and interact with the ballot. The ADA and Section 504 recognize that facially identical communication methods may not provide identical communication outcomes for qualified individuals with disabilities, and therefore specifically require public entities to "take appropriate steps to ensure that communications with applicants, participants, members of the public … with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1). The applicable regulations are clear that public entities must provide individuals with auxiliary aids and services to ensure effective communication under the ADA and Section 504:

> (b)(1) A public entity **shall furnish appropriate auxiliary aids and services** where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.

> (b)(2) . . . In determining what types of auxiliary aids and services are necessary, **a public entity shall give primary consideration to the requests of individuals with disabilities.** In order to be effective, auxiliary aids and services must be provided in **accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability**.

28 C.F.R. § 35.160 (emphasis added); *see also* 29 U.S.C. § 794. Auxiliary aids and services include "accessible electronic and information technology" such as the accessible absentee ballots and ballot request process Plaintiffs seek. 28 C.F.R. § 35.104. As to primary consideration of a Plaintiff's request for a particular accommodation, Defendants "must honor [Plaintiffs'] choice, unless [Defendants] can demonstrate that another equally effective means of communication is available or that the aid or service requested would fundamentally alter the nature of the program, service, or activity or would result in undue financial and administrative burdens." U.S. Dep't of Just., *ADA Update: A Primer for State and Local Governments*, 8 (2015), https://www.ada.gov/regs2010/titleII_2010/titleII_primer.pdf. "The decision that

17

compliance would result in such alteration or burdens must be made by the head of the public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion." 28 C.F.R. § 35.164.

Plaintiffs' preferred methods of communication include accessible electronic documents, Braille, and large print; Plaintiffs' preferred method of communication to vote does not include the use of a sighted assistant. Taliaferro Decl. ¶ 10; Durden Decl. ¶ 6; Gibbs Decl. ¶ 5; Scott Decl. ¶ 5; Bell Decl. ¶7; McEachern Decl. ¶ 6. Requiring Defendants to communicate with Plaintiffs via accessible electronic means such as e-mail and providing Plaintiffs accessible electronic ballots is not an undue burden or fundamental alteration. Defendants already permit certain voters to request, receive and submit their ballots electronically through their UOCAVA system. Happily, there are also many publicly available technologies that enable voters with disabilities to electronically receive and mark their absentee ballots privately and independently. These include tools available for free (such as Prime III and the State of Maryland online ballot marking tool) and for a fee (such as Democracy Live, Scytl, and Five Cedars). [20] Courts have ordered public entities to use such technologies. *Lamone*, 813 F.3d 494 (Maryland ballot marking tool); *Boockvar*, 2020 WL 2745729, at *6 ("accessible write-in ballot"). Courts have also ordered state agencies tasked with administering elections to make their websites, including online absentee ballot request systems, accessible to citizens with disabilities. *See, e.g., Hindel v. Husted*, No. 2:15-CV-3061, 2017 WL 432839, *4 (S.D. Ohio Feb. 1, 2017). Defendants'

---

[20] There are entities that provide funding to state agencies to offset the cost of implementing these tools, such as Tusk Philanthropies. Tusk Philanthropies, *2020 Request For Proposals*, MOBILE VOTING PROJECT, https://mobilevoting.org/2020-rfp/ (last visited Aug. 5, 2020).

Absentee Voting Program is discriminatory because of the absence of auxiliary aids and services, but this problem can be easily solved.

Many courts have already found that standard print absentee ballots discriminate against blind voters because of their disability. There are many reasonable solutions that Defendants can implement to remedy this discrimination. The law requires that they do so. Therefore, Plaintiffs are likely to succeed on the merits of their ADA and Rehabilitation Act claims.

### B. Plaintiffs Will Suffer Irreparable Harm If They Must Forego Voting Privately and Independently.

That Plaintiffs seek the Court's intervention regarding a discriminatory voting program is sufficient for Plaintiffs to show irreparable harm. Irreparable injuries are those that are non-compensable or cannot be adequately compensated by money damages. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994), *abrogated on other grounds by Natural Resources Defense Council*, 555 U.S. at 22; *L.J. ex rel. Darr v. Massinga*, 838 F.2d 118 (4th Cir. 1988). "Courts routinely deem restrictions on fundamental voting rights irreparable injury. . . . And once the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done . . . ." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (citing *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986); *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876 (3d Cir. 1997)). Another trial court in this circuit found that irreparable harm was shown where blind voters were deprived of the right to use an electronic accessible absentee ballot marking tool, prior to the added risks posed by a pandemic. *See Nat'l Fed'n of the Blind, Inc. v. Lamone*, Civ. Case No. RDB–14–1631, 2014 WL 4388342, *15 (D. Md. Sept. 4, 2014), *aff'd*, 813 F.3d 494 (4th Cir. 2016). ". . . Plaintiffs are being deprived of their right to vote by absentee ballot privately and independently,

19

and the end of that deprivation is nowhere in sight." *Id.* Most recently, the Middle District found that inaccessible voting procedures affecting a blind voter sufficiently established irreparable harm. *Democracy N.C. v. N.C State Bd. of Elections*, 2020 WL 4484063, at *61-*62.

The COVID-19 pandemic amplifies the irreparable harm to Plaintiffs. Now, blind voters "are effectively forced to choose between forfeiting their right to vote privately and independently or risking their health and safety by traveling to a polling place to vote in person. Such a choice burdens Plaintiffs' First Amendment right to vote." *Boockvar*, 2020 WL 2745729 at *5 (finding risk of irreparable harm). The risk is not speculative: At least fifty-two people were identified as having contracted COVID-19 at poll sites during the April 7, 2020 Wisconsin primary.[21] The risk of contracting COVID-19 is particularly acute for people who are at high risk of serious complications or death from COVID-19, including older adults (like Ms. Taliaferro at age 68), those with immune disorders, heart, lung, kidney, or liver disease, diabetes (like Mr. Durden), chronic lung disease (including chronic obstructive pulmonary disease), asthma, or obesity.[22] Blind people face distinct difficulties under the pandemic. Furthermore, many blind voters—including Plaintiffs—will have to use public transit or rideshare services to get to their polling places, magnifying their risks of exposure. Taliaferro Decl. ¶ 11; Gibbs Decl. ¶ 12: Scott Decl. ¶ 12; Bell Decl. ¶ 10; McEachern Decl. ¶ 9.

Plaintiffs have a right to vote privately and independently. Without an accessible absentee ballot, in the age of COVID-19, Defendants force Plaintiffs to choose between a private

---

[21] Scott Bauer, *52 people who worked or voted in Wisconsin election have COVID-19*, PBS NEWS HOUR (Apr. 29, 2020, 1:41 PM), https://www.pbs.org/newshour/health/52-people-who-worked-or-voted-in-wisconsin-election-have-covid-19.

[22] *See Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last updated July 30, 2020).

independent ballot that can only be accessed by risking their health and voting in person, or giving up the private and independent vote – that is their right – by using the Absentee Voting Program.  Plaintiffs have demonstrated irreparable harm.

### C.  The Balance of Hardships Tips in Plaintiffs' Favor.

The balance of hardships tips in favor of providing an accessible absentee ballot.  The proposed injunctive relief must pose more than mere fiscal and administrative problems to defendants to tip the balance away from the plaintiff who will suffer harm in the absence of relief. *See Todd ex. rel Todd v. Sorrell*, 841 F.2d 87, 88 (4th Cir. 1988); *Massinga*, 838 F.2d at 121-122 (defendants' harm, the expenditure of money to come into compliance with child welfare laws, not enough to tip the balance of hardships in its favor). Requiring defendants to comply with the law is not a cognizable hardship on a defendant. *See White v. Martin*, No. 02-4154-CV-C-NKL, 2002 U.S. Dist. LEXIS 27281, 22-23 (W.D. Mo. 2002); *citing Haskins v. Stanton*, 794 F.2d 1273, 1277 (7th Cir. 1986) (finding that an injunction requiring defendants to comply with existing law imposes no burden but "merely seeks to prevent the defendants from shirking their responsibilities").

Here, the "irreparable injury Plaintiffs would suffer to their fundamental right to vote" by not providing an accessible absentee ballot during COVID-19 outweighs any regulatory or monetary costs to Defendants.  *See Boockvar*, 2020 WL 2745729, at *5.  *See also Democracy N.C. v. N.C State Bd. of Elections*, 2020 WL 4484063 at *62.  (finding that balance tipped in favor of blind voter seeking access to the ballot).  The balance of equities especially tips in favor of Plaintiffs because an electronic absentee voting "tool is available and capable of implementation at this time."  *See Lamone*, 2014 WL 4388342 at *15.  That very same tool referenced in *National Federation of the Blind, Inc. v. Lamone* is available to Defendants <u>for</u>

free.  Defendants already provide ballots by email and fax to some UOCAVA voters, and permit return of those ballots by email and fax.  Permitting blind voters to use the UOCAVA voting process is readily achievable and has minimal costs.  There are additional electronic ballot marking tools available to Defendants, including free tools like Prime III, and commercially available tools like Scytl, Five Cedars, and Democracy Live.  Making the absentee ballot request process would be similarly straightforward: Defendants are currently building an online ballot request system which they are already required under the ADA to make accessible to Plaintiffs and other North Carolina citizens with disabilities.

Finally, Defendants have between now and November 3 to identify and implement an accessible absentee voting solution.  This is a considerable period of time compared to how long other state boards of elections have implemented accessible absentee voting in other elections affected by COVID-19 this year: four days in Michigan in *Powell v. Benson*, Case 2:20-cv-11023-GAD-MJH (E.D. Mich. May 1, 2020) (attached as Exhibit C); six days in Pennsylvania in *Drenth v. Boockvar*, Civil No. 1:20-CV-00829, 2020 WL 2745729 (M.D. Pa. May 27, 2020); twelve days in Tennessee (Keller Decl. ¶ 5); and nineteen days in New York in *Hernandez v. New York State Board of Elections*, Case 1:20-cv-04003-LJL (S.D.N.Y. June 2, 2020) (attached as Exhibit D).  Between the rights at stake and the relative ease of the solution, the balance of equities tips in favor of Plaintiffs.

### D.  Accessible Absentee Voting is in the Public Interest.

A preliminary injunction directing accessible absentee voting is in the public interest. Voting is a "critical area" for people with disabilities that Congress meant to protect in passing the ADA.  42 U.S.C. § 12101(a)(3).  "[T]he public has a strong interest in exercising the 'fundamental political right' to vote, " *Husted*, 697 F.3d at 436-37 (internal quotations omitted),

and "[t]he public interest ... favors permitting as many qualified voters to vote as possible,"
*North Carolina*, 769 F.3d at 247. "[U]pholding constitutional rights serves the public interest."
*Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003). An
injunction "assur[ing] that people with disabilities can vote privately and independently by
absentee ballot" is in the public interest even in the absence of a public health crisis. *See
Lamone*, 2014 WL 4388342 at *15. The same holds true during the COVID-19 pandemic.
*Boockvar*, 2020 WL 2745729, at *5. The public interest weighs heavily in favor of preventing
infringement upon the fundamental right to vote, *Democracy N.C. v. N.C State Bd. of Elections*,
2020 WL 4484063 at *62, as does the public interest in promoting public health by providing
access to accessible absentee voting during a pandemic, *see Delia*, 709 F.3d at 331 (promoting
the public health is in the public interest). The public interest weighs in favor of issuing this
preliminary injunction.

## II.    THE COURT SHOULD NOT REQUIRE A BOND.

Plaintiffs respectfully submit that the Court should waive the requirement that Plaintiffs
give security in the event a preliminary injunction is issued. Pursuant to FED. R. CIV. P. 65(c),
Federal courts routinely exercise their discretion and waive bond requirements in suits seeking to
enforce important federal rights of public interest. *See, e.g., Delia*, 709 F.3d at 331-332 (district
courts may waive the security requirement); *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th
Cir. 1999) (noting that the district courts may appropriately determine the amount of the security
required under Rule 65); *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996)
(affirming the district court's decision not to require bond); *Moltan Co. v. Eagle-Picher Indus.,
Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (finding that the district court has discretion to require
posting of security); *Stockslager v. Carroll Elec. Coop. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976)

(the amount of the bond required rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of a finding of abuse of discretion). Important federal rights guaranteed by Section 504 and Title II of the ADA are at stake in this litigation. Plaintiffs demonstrate a likelihood of success on the merits, and the injunction merely seeks to require Defendant to comply with federal law. If granted, the injunction poses little if any financial risk to Defendant. Accordingly, no bond should be required.

## CONCLUSION

Under the law, Defendants must offer Plaintiffs the same options that they offer all other North Carolina voters: To vote privately and independently via an accessible absentee ballot. Plaintiffs therefore request that this Court issue a preliminary injunction directing Defendants to provide an accessible absentee ballot and processes for requesting, receiving, signing, and returning absentee ballots for the November 2020 General Election. Plaintiffs additionally request that no bond be required as important federal rights are at stake, and the financial cost to Defendants should the preliminary injunction issue are *de minimus*.

This 12th day of August, 2020.                    Respectfully submitted,

/s/ Holly Stiles _____
Holly Stiles
holly.stiles@disabilityrightsnc.org
N.C. State Bar No. 38930
Lisa Grafstein
lisa.grafstein@disabilityrightsnc.org
N.C. State Bar No. 22076
DISABILITY RIGHTS NC
3724 National Drive, Suite 100
Raleigh, NC 27612
Phone: (919) 856-2195
Fax:    (919) 856-2244

/s/ Stuart Seaborn _____
Stuart Seaborn*

24

sseaborn@dralegal.org
C.A. State Bar No. 198590
Rosa Lee Bichell*
rbichell@dralegal.org
C.A. State Bar No. 331530
DISABILITY RIGHTS ADVOCATES
2001 Center St #4
Berkeley, CA 94704
Phone: (510) 665-8644
Fax:    (510) 665-8511

Christina Brandt-Young*
cbrandt-young@dralegal.org
N.Y. State Bar No. 4165189
DISABILITY RIGHTS ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017
Tel:  (212) 644-8644
Fax:  (212) 644-8636


ATTORNEYS FOR PLAINTIFFS